**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRIAN FREDERICK BENTLER,** | : | **Civil No. 1:21-cv-913** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security[1],** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

## I.    Introduction

This Social Security appeal has a protracted history, spanning some seven years, and a voluminous administrative record, which encompasses more than 2,300 pages. However, in the final analysis, we believe that the resolution of this case turns on consideration of a simple error in assessing the medical opinion evidence. The plaintiff, Brian Bentler, suffers from a cascading array of severe physical and emotional impairments, including obesity with body mass index over 50, diabetes mellitus, neuropathy, post-traumatic hemicrania continua and migraine headaches,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g) Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

post-concussion syndrome, seizure disorder, degenerative disc disease of the cervical and lumbar spine, major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder (PTSD), and personality disorder. (Tr. 13).

With respect to Bentler's migraine headaches, one of his primary impairments, his treating neurologists agreed that Bentler suffered from severe, constant daily headaches accompanied by nausea, occasional vomiting, as well as photo and phonophobia, a medical condition that they diagnosed as status migrainosus. These treating neurologists deemed Bentler's status migrainosus to be so severe that they opined that this condition was entirely disabling.

In denying Bentler's claim, the Administrative Law Judge discounted this treating source specialist medical consensus in favor of the opinion of a non-treating, non-examining physician who was not a trained neurologist, Dr. Charles Cooke. According to the ALJ:

> Dr. Cooke testified he could not base an opinion of the claimant being unable to work based on the claimant's subjective reports regarding his migraine headaches, as opposed to muscle tension. Although, Dr. Cooke testified the claimant's headaches might interfere with the ability to work. The opinions of Dr. Cooke are given great weight because they were supported by a detailed explanation and consistent with the diagnostic and clinical evidence of record, along with the claimant's treatment history and with the record as a whole.

(Tr. 22).

However, it is now apparent that Dr. Cooke's medical opinion, which was a lynchpin in the ALJ's decision and was afforded greater weight than this treating source consensus, was based upon a basic misreading of the clinical record. Thus, while Dr. Cooke rejected Bentler's claims that he suffered from intractable, disabling status migrainosus, he did so based upon his misunderstanding of his treatment history. Specifically, in response to questioning by the plaintiff's counsel Dr. Cooke testified as follows:

> Q: How would, how would the, how would severe migraines on a daily basis limit an individual to work on a daily basis?
>
> A Well if they had it on a daily basis continuously that would be called status migrainosus and that might interfere with it *but that, that is a very rare thing and I did not see the words status migrainosus used in the record,* except it's almost 2,000 pages, I would say that if you noticed it in there and I missed it please call it to my attention.

(Tr. 102-03) (Emphasis added).

Dr. Cooke's assertion that he did not discern the diagnosis of status migrainosus in Bentler's medical history is undeniably incorrect. Quite the contrary, the medical record is replete with references to this condition, which was identified and diagnosed more than 40 times by Bentler's treating sources.

Thus, in the instant case we are presented by an ALJ's decision which rejected the opinions of multiple treating source specialists in favor of the judgment of a non-treating, non-examining, non-specialist medical source, whose opinions were based

upon a fundamental misreading of the medical record, one which failed to identify some four dozen diagnoses of Bentler's status migrainosus.

In our view much more is needed here in order to sustain this decision. Accordingly, for the reasons discussed below, we will remand this case for further consideration by the Commissioner.

## II.   <u>Statement of Facts and of the Case</u>

### A. <u>Procedural History</u>

This case has a protracted procedural history spanning some seven years. On May 28, 2015, Brian Bentler applied for disability insurance benefits, alleging an onset of disability on January 24, 2015. (Tr. 171-72). It is undisputed, and the ALJ has expressly found, that Bentler suffers from a cascading array of severe physical and emotional impairments including obesity with body mass index over 50, diabetes mellitus, neuropathy, post-traumatic hemicrania continua and migraine headaches, post-concussion syndrome, seizure disorder, degenerative disc disease of the cervical and lumbar spine, major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder (PTSD), and personality disorder. (Tr. 13).

Despite the uncontested fact that Bentler has experienced this significant array of severe impairments, the administrative progress of his case has been slow. After Bentler's initial application was denied, (Tr. 220), the plaintiff timely requested an

ALJ hearing on November 20, 2015. (Tr. 225). Nearly two years passed before a hearing was conducted by an ALJ on June 22, 2017. (Tr. 131-170). On November 1, 2017, the ALJ issued an initial decision denying Bentler's claim. (Tr. 187-211). However, on February 5, 2019, the Social Security Appeals Council remanded Bentler's case for reconsideration by an ALJ, citing inadequacies in the analysis of some of the medical opinions. (Tr. 212-16).

Thus, it was against this procedural backdrop marked by some four years of delay, that Bentler's case came to be considered for a second time by an ALJ in 2019.

## B. The Medical Evidence Relating to Bentler's Status Migrainosus

Following the remand of this case for an second ALJ hearing, one of the most significant issues in this disability determination involved assessing the severity of Bentler's migraine headaches. With respect to Bentler's migraines, the clinical record is replete with evidence indicating that Bentler suffered from severe, constant daily headaches accompanied by nausea, occasional vomiting, as well as photo and phonophobia, a medical condition that his treating neurologists diagnosed as status migrainosus. In fact, Bentler's medical records contain some forty eight references to this diagnosis of status migrainosus. (Tr. 2095, 2096, 2097, 2101, 2102, 2106, 2107, 2108, 2115, 2116, 2155, 2156, 2158, 2162, 2168, 2169, 2170, 2177, 2181,

5

2188, 2190, 2198, 2199, 2200, 2202, 2210, 2211, 2223, 2270, 2271, 2273, 2278, 2279, 2280, 2282, 2283, 2288, 2289, 2293).

During the relevant time period, Bentler was examined and treated by two specialist neurologists, Dr. Roderick Spears and Dr. Ramon Diaz-Arrastia, for these persistent, intractable migraines. For his part, Dr. Spears has opined that:

> [Bentler] has also been able to associate that his intractable migraines are 8/10 in severity and occur 3 to 4 days after routine physical activity. This would include walking, lifting and climbing; which are all more physically taxing than routine physical activity. The headaches are migrainous in nature resulting in sensitivity to the environment and significant disability on a daily basis. In addition to his Case 1:21-cv-00913-MCC Document 19 Filed 01/20/22 Page 9 of 22 Dr. Spears also authored a narrative report on his 6 patient's disabling migraines on January 1, 2018, noting that he had a "poor prognosis for functional recovery" (R. 2085-86). 10 seizures and the associated altered cognition during that event, he has experienced memory loss and language impairment since the MVA that occurred January of 2015. These cognitive changes support the diagnosis of post-concussive syndrome.

> Treatment of these conditions without benefit include: Botox, Facet Blocks, Nerve blocks, Baclofen, Magnesium, Losartan, Keppra, Zonlsamida, Wellbutrin, Topamax, Lexapro, Cymbalta, Amlopidine. Under my care he has resumed Botox injections and tried the following medications during that time: Celebrex, Indomethacin, Lynea, Losartan, Zanaflex, Seroquel, and Nerve blocks. Mr. Bentler has never become headache free during that time and has only achieved a mild reduction in pain severity from a 10/10 down to an 8/10 at times.

> Mr. Bentler's prognosis is poor. His severe daily migrainous headaches limit his ability to physically function due to both the trigger effect it has on future migraines as well as the associated features experienced during these migraines. His cognitive impairment has never resumed to

his baseline following the MVA in January 2015. The seizures he experiences further alter his mental status. All of these factors render his ability to perform in these roles impossible and unsafe.

(Tr. 2157).

Dr. Spears has also explained that, based upon three years of treating Bentler, he "has a poor prognosis for functional recovery," and "he has not demonstrated significant improvement." (Tr. 2085). These findings, in turn, were echoed by another treating and examining neurologist, Dr. Diaz-Arrastia, who reported that the plaintiff "has daily migraine-like headaches, . . . usually associated with nausea, occasionally vomiting, and photo and phonophobia." (Tr. 2214). According to Dr. Diaz-Arrastia, Bentler:

> [S]uffered a mild TBI, which has unfortunately been disabling for the past 4 years. The major disability is related to his post-traumatic migraines, which are being managed by Dr. Spears, who is our region's expert on this problem.

(Tr. 2217).

It was on this record that the impact of Bentler's status migrainosus upon his disability application came to be considered by the ALJ.

## C.    The ALJ's Hearing and Decision

With Bentler's status migrainosus identified as one of his principal impairments, a hearing was conducted in Bentler's case on August 5, 2019. (Tr. 68-130). At this hearing, Dr. Charles Cooke testified as a medical expert. (Tr. 86- 105).

7

Dr. Cooke had never treated, examined, or seen Bentler. Instead, his testimony was based solely upon a review of the medical records. (Tr. 86). Moreover, unlike Dr. Spears, Bentler's primary treating source, Dr. Cooke was not a neurologist. Rather, he was an internist who specialized in rheumatology. (Tr. 2294-2304). According to Dr. Cooke, his review of Bentler's medical records suggested that Bentler could perform sedentary work. (Tr. 94). With respect to Bentler's migraines, Dr. Cooke's testimony was dismissive, with the doctor simply observing that: "He has been through any number of neurologists and other people to evaluate this and has had a host of treatments for it, there has been some improvement but the neurological examinations on this have been unremarkable, no objective findings." (Tr. 88-89).

On cross examination, Dr. Cooke acknowledged that his medical opinion regarding the severity of Bentler's migraines was based solely upon his review of the plaintiff's medical records. (Tr. 99). Dr. Cooke then characterized Bentler's symptoms, his photo and phonophobia, as merely "subjective" evidence which he afforded little weight. (Tr. 100). Dr. Cooke went on to testify as follows:

> Q: How would, how would the, how would severe migraines on a daily basis limit an individual to work on a daily basis?
>
> A Well if they had it on a daily basis continuously that would be called status migrainosus and that might interfere with it *but that, that is a very rare thing and I did not see the words status migrainosus used in the record,* except it's almost 2,000 pages, I would say that if you noticed it in there and I missed it please call it to my attention.

8

(Tr. 102-03) (emphasis added).

On this score, Dr. Cooke's testimony was simply incorrect. Contrary to the doctor's representation, the medical records are replete with references to this diagnosis of status migrainosus. Indeed there are more than 40 notations of this diagnosis in Bentler's medical files that were reviewed by Dr. Cooke.[2]

Following this hearing, on November 20, 2019, the ALJ issued a decision denying this application for benefits. (Tr. 8-28). In that decision, the ALJ first concluded that Bentler met the insured requirements of the Act. (Tr. 13). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Bentler suffered from a cascading array of severe physical and emotional impairments including obesity with body mass index over 50, diabetes mellitus, neuropathy, post-traumatic hemicrania continua and migraine headaches, post-concussion syndrome, seizure disorder, degenerative disc disease of the cervical and lumbar spine, major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder (PTSD), and personality disorder. (Tr. 13).

---

[2] Tr. 2095, 2096, 2097, 2101, 2102, 2106, 2107, 2108, 2115, 2116, 2155, 2156, 2158, 2162, 2168, 2169, 2170, 2177, 2181, 2188, 2190, 2198, 2199, 2200, 2202, 2210, 2211, 2223, 2270, 2271, 2273, 2278, 2279, 2280, 2282, 2283, 2288, 2289, 2293.

At Step 3, the ALJ determined that none of these impairments met or medically equaled the severity of one of the listed impairments. (Tr. 14-17). Between Steps 3 and 4, the ALJ concluded that Bentler retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant is limited to occupations that can be performed with the use of a cane for ambulation, as needed. The claimant is limited to occupations that require no more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling and climbing on ramps and stairs. The claimant must avoid occupations that require climbing on ladders, ropes or scaffolds. The claimant must be afforded the option to sit and stand during the workday for brief periods of a few minutes every half hour or so. The claimant must avoid concentrated, prolonged exposure to fumes, odors, dusts, gases, chemical irritants, environments with poor ventilation or temperature extremes. The claimant is limited to occupations that do not require frequent exposure to dangerous machinery and unprotected heights or the need to converse over excessive background noise. The claimant is limited to occupations requiring no more than simple, routine, repetitive tasks not performed in a fast-paced production environment, involving only simple, work-related decisions and in general few workplace changes. The claimant is limited to occupations requiring no more than occasional interaction with supervisors, coworkers and members of the public.

(Tr. 17).

In reaching this decision, the ALJ considered, but rejected, Bentler's medically supported claim that his migraines were disabling. On this score, the ALJ

10

afforded the opinion of Dr. Cooke, a non-treating, non-examining, non-specialist "great weight," stating that:

> Dr. Cooke testified he could not base an opinion of the claimant being unable to work based on the claimant's subjective reports regarding his migraine headaches, as opposed to muscle tension. Although, Dr. Cooke testified the claimant's headaches might interfere with the ability to work. The opinions of Dr. Cooke are given great weight because they were supported by a detailed explanation and consistent with the diagnostic and clinical evidence of record, along with the claimant's treatment history and with the record as a whole. Further, Dr. Cooke is an impartial medical expert who is familiar with the requirements found in the listings and has had the opportunity to review claimant's medical records.

(Tr. 22). Thus, the significant weight given Dr. Cooke's opinions was based in large measure on the ALJ's determination that the doctor "has had the opportunity to review claimant's medical records." (Id.) However, the ALJ's decision did not address, analyze, or even acknowledge the fact that Dr. Cooke's review of Bentler's records had failed to discern what Dr. Cooke admitted was a medically significant fact—the multiple diagnoses of status migrainosus contained in those records.

In contrast, the ALJ gave far less weight to the statements provided by those neurologists who had actually examined and treated Bentler, describing these specialist opinions as "vague." (Tr. 24). Having discounted the opinions of all of the treating neurologists in favor of the judgment of a non-treating, non-examining , non-specialist, whose testimony reflected that he had misread the medical record,

11

ALJ found that Bentler could not return to his past relevant work but could perform jobs that existed in significant numbers in the national economy. (Tr. 26-28). Accordingly, the ALJ determined that Bentler had not met the demanding showing necessary to sustain this claim for benefits and denied this claim. (Tr. 28).

This appeal followed. (Doc. 1). On appeal, Bentler challenges the adequacy of the ALJ's decision, arguing in part the ALJ erred in the evaluation of the medical opinion evidence when he rejected the treating source consensus regarding the severity of Bentler's migraines based upon the opinion of a non-treating, non-examining, non-specialist who apparently overlooked more than 40 notations diagnosing the plaintiff with status migrainosus. This appeal is fully briefed by the parties and is, therefore, ripe for resolution. As discussed in greater detail below, we believe that the ALJ's reliance upon a non-treating, non-examining course who appears to have misread and misunderstood the medical record in terms of this diagnosis of status migrainosus was error which prejudiced Bentler and now compels a remand.[3]

---

[3] We note that Bentler also argues that the ALJ's decision was constitutionally defective because the appointment of Andrew Saul as a single Commissioner of the Social Security Administration ("SSA") who is removable only for cause and serves a longer term than that of the President violates separation of powers. However, because we are remanding this case based upon an error in the evaluation of the medical evidence, we do not find it necessary to reach this issue. Simon v.

III.   **Discussion**

A.   **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

---

Kijakazi, No. 1:20-CV-02064, 2022 WL 828935, at *4 n. 3 (M.D. Pa. Mar. 18, 2022).¹

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

      The Supreme Court has underscored for us the limited scope of our review in

this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v.
> Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

Biestek, 139 S. Ct. at 1154.

      The question before this Court, therefore, is not whether the claimant is

disabled, but rather whether the Commissioner's finding that [she] is not disabled is

supported by substantial evidence and was reached based upon a correct application

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "<u>Burnett</u> does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

## B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a

claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C.

§1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this

requirement, a claimant must have a severe physical or mental impairment that

makes it impossible to do his or her previous work or any other substantial gainful

activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the

claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

18

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F.Supp.2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize

the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns, 312 F.3d 113; see also Rathbun, 2018 WL 1514383, at *6; Metzger, 2017 WL 1483328, at *5.

20

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

**C.**     **Standard of Review: Analysis of Medical Opinion Evidence.**

The Commissioner's regulations which were in effect at the time of these administrative proceedings also set standards for the evaluation of medical evidence, and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's]

21

physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to afford competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally were entitled to more weight. See 20 C.F.R. §404.1527(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record). These benchmarks, which emphasize consideration of the nature of the treating relationship, also call for careful consideration of treating source opinions.

Indeed, this court has often addressed the weight which should be afforded to

a treating source opinion in Social Security disability appeals under the regulations

which applied prior to March 2017 and emphasized the importance of such opinions

for informed decision-making in this field, stating that:

> Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001)(citing 20 CFR § 404.1527(c)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Oftentimes referred to as the "treating physician rule", this principle is codified at 20 CFR 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794 F.2d 896 (3d Cir. 1986). The regulations also address the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 CFR § 404.1527(c)(2). "A cardinal principle guiding disability, eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)(citations omitted); See also Brownawell v. Commissioner of Social Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." Morales v. Apfel, supra at 317 .

Morder v. Colvin, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24,

2016). Thus, an ALJ may not unilaterally reject a treating source's opinion, and

substitute the judge's own lay judgment for that medical opinion. Instead, under the applicable regulations the ALJ typically may only discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c).

In conducting this analysis the ALJ also must consider, and may follow, the opinions of non-treating sources like state agency experts or outside consultants. At the initial level of administrative review, state agency medical and psychological consultants may act as adjudicators. See SSR 96-5p, 1996 WL 374183 at *4. As such, they do not express opinions; they make findings of fact that become part of the determination. Id. At the ALJ and Appeals Council levels of the administrative

review process, however, findings by non-examining state agency medical and psychological consultants should be evaluated as medical opinion evidence. 20 C.F.R. § 404.1527(e) (effective Aug. 24, 2012, through Mar. 26, 2017). As such, ALJs must consider these opinions as expert opinion evidence by non-examining physicians and must address these opinions in their decisions. SSR 96-5p, 1996 WL 374183 at *6. However, it is well settled that opinions by non-treating and non-examining medical sources can be given weight "*only insofar as they are supported by evidence in the case record*." SSR 96-6p, 1996 WL 374180 at *2. (emphasis added).

Accordingly, under the applicable regulations governing Bentler's case, treating source opinions are to be afforded substantial weight, and the judgment of a non-treating, non-examining source like Dr. Cooke can be given weight only to the extent that the opinion is supported by information in the case record. Further, "[w]here ... the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer, 186 F.3d at 429).

It is against these legal guideposts that we assess the ALJ's decision in the instant case.

**D**    **This Case Will Be Remanded for Further Consideration of the Medical Opinion Evidence.**

This case involves an unusual circumstance. Despite the clear regulatory preference in the then-existing regulations which favored treatment source opinions, the ALJ afforded great weight to a non-examining, non-treating, non-specialist medical opinion. Yet, it is apparent that this expert, Dr. Cooke, whose familiarity with Bentler's medical conditions was based solely upon a review of the plaintiff's medical records, had misread those records in a material way. In his testimony, Dr. Cooke discounted any diagnosis of status migrainosus, testifying that "I did not see the words status migrainosus used in the record." (Tr. 103). Dr. Cooke was undeniably incorrect on this score. Quite the contrary, the medical records contained more than forty notations diagnosing Bentler with status migrainosus. (Tr. 2095, 2096, 2097, 2101, 2102, 2106, 2107, 2108, 2115, 2116, 2155, 2156, 2158, 2162, 2168, 2169, 2170, 2177, 2181, 2188, 2190, 2198, 2199, 2200, 2202, 2210, 2211, 2223, 2270, 2271, 2273, 2278, 2279, 2280, 2282, 2283, 2288, 2289, 2293).

The failure to address, analyze, or even acknowledge this significant discrepancy between the clinical evidence and Dr. Cooke's opinion which rested upon his assertion that "I did not see the words status migrainosus used in the record," (Tr. 103), in our view compels a remand of this case for further consideration by the Commissioner. Recognizing that the opinions of non-

26

examining medical sources can be given weight "*only insofar as they are supported by evidence in the case record*." SSR 96-6p, 1996 WL 374180 at *2, (emphasis added), it follows that when a non-treating source that is relied upon by the ALJ affirmatively and materially misstates the medical record, that a remand is necessary to further consider this medical evidence.

So it is in the instant case. Dr. Cooke's testimony regarding the severity of Bentler's migraines failed to take into account a well-documented fact; namely, the fact that Bentler had been diagnosed as suffering from status migrainosus on dozens of occasions. In this regard, Dr. Cooke acknowledged: "Well if the [claimant] had it on a daily basis continuously that would be called status migrainosus and that might interfere with" Bentler's ability to work on a sustained basis, "but that, that is a very rare thing and I did not see the words status migrainosus used in the record". (Tr. 102). Thus, as Dr. Cooke himself conceded, such a diagnosis, which would be tantamount to a finding that Bentler experienced frequent, severe, intractable migraines, could well support a disability determination. Yet Dr. Cooke apparently never identified this diagnosis in his medical records review, a significant oversight which undermines the reliance that can be placed upon the doctor's opinion. Given that "[w]here ... the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but

'cannot reject evidence for no reason or for the wrong reason.' " <u>Morales,</u> 225 F.3d at 317, we find that the ALJ's reliance on Dr. Cooke's opinion, an opinion grounded on an apparent misreading of the clinical record, constituted that "wrong reason" for discounting the treating source consensus regarding the severity of these migraines. Therefore this case must be remanded for further consideration by the Commissioner.

Yet, while case law calls for a remand and further proceedings by the ALJ in this case, assessing this claim in light of this evidence, nothing in our opinion should be construed as suggesting what the outcome of that final and full analysis should be. Rather, that final assessment of the evidence must await a thorough consideration and development of this evidence on remand by an ALJ. Therefore, nothing in this opinion should be deemed as expressing a view on what the ultimate outcome of any reassessment of this evidence should be. Rather, that task should remain the duty and province of the ALJ on remand.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that this case be REMANDED for further consideration of the Plaintiff's application.

An appropriate order follows.

.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: August 15, 2022